# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3988-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.H.,

     Defendant-Appellant,

and

J.C.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.C.,

     a Minor.

_____

Argued January 7, 2019 – Decided February 19, 2019

Before Judges Fasciale and Gooden Brown.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0015-18.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Katherine A. Gregory, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Katherine A. Gregory, on the brief).

Todd S. Wilson, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, on the brief).

PER CURIAM

Defendant T.H.[1] appeals from the April 20, 2018 judgment of guardianship that terminated his parental rights to his daughter, G.C., born September 2015. G.C.'s mother, J.C., gave a voluntary identified surrender of her parental rights to her daughter's non-relative resource parents, and is not a party to this appeal.[2] Defendant contends that plaintiff, New Jersey Division of

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] J.C. had four other children, none of whom were in her care.

A-3988-17T1

Child Protection and Permanency (Division), failed to prove all four prongs of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, and the trial court erred in finding otherwise. The Law Guardian joins the Division in urging us to affirm. Having considered the parties' contentions in light of the record and applicable legal standards, we affirm.

N.J.S.A. 30:4C-15.1(a)(1) to -15.1(a)(4) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his [or her] resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

3

(4) Termination of parental rights will not do more harm than good.

These standards are not "discrete and separate[,]" but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). Notably, the best interests standard is applied in light of "New Jersey's strong public policy in favor of permanency[,]" and "the child's need for permanency and stability emerges as a central factor." Id. at 357.

On August 3, 2017, the Division filed a verified complaint to terminate defendant's parental rights and award the Division guardianship of G.C. We will not recite in detail the circumstances that led to the filing of the guardianship complaint, which began with the emergency removal of G.C. on October 9, 2015, shortly after she was born suffering from neonatal abstinence syndrome, methadone exposure, and intense withdrawal symptoms. At the time, defendant and J.C., who admitted to relapsing on heroin and undergoing methadone treatment during her pregnancy, were incarcerated at the Cumberland County jail on drug-related charges. Although defendant initially identified his paternal grandmother as a possible placement option for G.C., he

explained that she had reservations until his paternity was confirmed,[3] and she refused to provide her background information to the Division. Thus, after being discharged from the hospital approximately one month after she was born, G.C. was placed with her current resource parents where she has remained throughout the litigation.

The guardianship trial was conducted on April 19, 2018. At the trial, in addition to authenticating numerous documentary exhibits that were admitted into evidence, Division caseworker Kelly Hunt testified about the Division's involvement with defendant, detailing his history of substance abuse, incarcerations, and unstable housing. She also recounted the Division's efforts to provide services to help defendant correct these circumstances and assess placement options. Division expert Linda Jeffrey, Ph.D., testified about the bonding evaluation she conducted on November 29, 2017, between G.C. and the resource parents. Defendant testified on his own behalf, stating that he loved G.C., and objected to the termination of his parental rights. Defendant's plan was for G.C. to be placed in the custody of a family member, such as his sister, K.B., with whom he would co-parent. However, defendant admitted that K.B.

---

[3] Defendant's paternity was later confirmed on December 9, 2015.

never visited G.C. during the pendency of the litigation nor filed any paperwork seeking custody.

We incorporate by reference the factual findings and legal conclusions in the trial judge's oral opinion rendered from the bench on April 20, 2018, following the guardianship trial. We only recite the judge's key findings supporting her decision. Preliminarily, the judge found Dr. Jeffrey and caseworker Hunt to be "credible" witnesses. In contrast, the judge found that defendant was not "credible[,]" "very disingenuous," "misleading," and "did not tell the whole truth[.]" Based on defendant's testimony, the judge determined that rather than asserting his right to parent and care for his child, defendant's plan was for G.C. to be placed with his sister "because there[] [was] a blood relationship," despite the fact that G.C. "ha[d] been thriving in the care of . . . her resource" parents virtually since birth.

The judge reviewed the circumstances of G.C.'s birth and the Division's involvement with defendant[4] over the two-and-one-half years that G.C. was in

---

[4] Defendant had a history with the Division that predated G.C.'s birth, having resided in several different foster homes until he signed himself out of the system at age eighteen.

A-3988-17T1

placement.[5] During that time period, defendant was incarcerated until May 2016 when he was admitted into Drug Court. Through Drug Court, defendant participated in a four-month in-patient drug treatment program from May to September 2016, and resided at a half-way house for recovering addicts from September 2016 until he was discharged in October 2016 and incarcerated until January 2017 for pushing his substance abuse counselor over a disagreement involving a cell phone. The discharge summary noted that "[t]he only goal" defendant "accomplished was employment" as he "failed to address any issues related to his substance use disorder."

After his release, defendant was required through Drug Court to attend an intensive outpatient drug treatment program, attend school, and maintain employment. However, primarily as a result of Drug Court sanctions, defendant was incarcerated intermittently. Specifically, in April 2017, defendant was incarcerated for violating Drug Court rules by having a positive urine screen. This occurred shortly after the caseworker had been advised by defendant's counselor that he was making progress. Defendant was again incarcerated in

---

[5] Although there was no finding of abuse or neglect under Title 9, N.J.S.A. 9:6-8.21(c), the court maintained jurisdiction under Title 30, N.J.S.A. 30:4C-12, and continued the Division's custody of G.C., as a child who was part of a family in need of services.

A-3988-17T1

June 2017 on domestic violence related charges involving his new paramour, whom he had met in Drug Court and with whom he later fathered a child in approximately January 2018, in violation of Drug Court's anti-fraternizing policy. Defendant was also incarcerated in March 2018 for another unspecified Drug Court sanction.

In addition to receiving services through Drug Court, including random urine screens and certified alcohol and drug counselor (CADC) assessments, the Division provided numerous services to defendant, including visitation both while he was incarcerated and upon his release; a psychological assessment; a bonding evaluation; counseling services; bus passes; and a housing list. According to Hunt, the Division did not provide defendant with substance abuse services "[b]ecause he was already receiving [those] services through Drug Court." Hunt testified that defendant's noncompliance and multiple incarcerations "throughout the history of the case . . . affect[ed] [the] completion of the services."

For example, although defendant completed a psychological evaluation on December 27, 2016, while he was incarcerated, he failed to appear for the psychological and bonding evaluation scheduled for December 22, 2017, with Dr. Jeffrey despite being given ample notice. Defendant also failed to attend

8

counseling sessions with Dr. Schafer that were recommended in the December 2016 psychological evaluation.  Additionally, once defendant was released from confinement or a structured environment, his visitation with G.C. became "very inconsistent," he was "often late[,]" he left early on occasion, and he attributed several cancelled visits to conflicts with his work schedule or his Drug Court obligations.[6]  However, Hunt testified that when she conferred with defendant's Drug Court team, she was advised that "Drug Court actually work[ed] around his visitation schedule[,]" and that defendant "was reporting to Drug Court that he was going to visits with his daughter" when "he was not."

By the time the guardianship trial was conducted, defendant had not visited G.C. since September 2017, and only visited G.C. once in August 2017 and once in September 2017.  In addition, defendant was still in phase one of Drug Court's four-phase program which, according to Hunt, exposed him to incarceration for non-compliance with Drug Court rules.  Defendant's Drug Court probation officer advised Hunt that defendant should have been further along given the length of time he had been participating in the program, but

---

[6]  Hunt also noted that there were concerns about defendant's interaction with G.C. during certain visits.  For example, defendant failed to heed repeated warnings that G.C. had to be placed in a car seat while driving in a vehicle.

"there was an issue with [defendant] actually completing what he start[ed,]" which impeded his advancement to the next level.

Hunt described defendant's "employment history" as "sporadic" and his housing as unsuitable. In March 2017, when defendant requested assistance from the Division with a security deposit in order to obtain an apartment, the caseworker advised that she would have to go over a budget plan with defendant to confirm that he could afford the apartment. In May 2017, defendant met with the worker and completed a budget sheet. These efforts were derailed, however, by defendant's incarceration in April 2017 and June 2017. In February 2018, when Hunt discussed with defendant his noncompliance with services, defendant stated that he had not worked in several months but he was attending school to obtain his GED. Hunt later learned that defendant "stopped going to his GED classes" before obtaining his GED. Defendant also commented to Hunt during the February 2018 meeting that the Division's services were "a waste of his time" and that "he had other things going on in his life," including a newborn child. At the time, defendant was residing with his sister, P.B., who had been considered for placement by the Division and ruled out as a placement option because "[her] home ha[d] insufficient space to meet [G.C.'s] . . . needs."

In addition to P.B., at defendant's and J.C.'s request, the Division looked into several other family members as placement options for G.C., including J.C.'s father, defendant's mother, defendant's other sister, K.B., and T.R., whose relationship to defendant was unclear. All of these individuals were ruled out for a variety of reasons and were sent rule out letters, which advised them of the reasons for the decision, their responsibility to inform the Division of a change in circumstances, their right to request a review or reconsideration of the decision, and the possibility that termination of parental rights may occur if the child remained in the resource family's care for more than six months.[7] Other than K.B., who was also ruled out because her home had insufficient space to meet G.C.'s needs, none of the individuals requested reconsideration. K.B.'s request for reconsideration in the fall of 2017 was rejected because at that juncture, G.C. had been with her resource parents for nearly two years and it was determined that removing her would not be in her best interests.

G.C.'s permanency plan languished because the court granted two three-month extensions and one thirty-day extension to allow defendant to complete

---

[7] J.C.'s father was ruled out for "health issues." Defendant's mother was ruled out because "confidential information . . . indicate[d] [G.C.] may be at risk of harm if placed in [her] home." T.R. was ruled out because she withdrew from consideration.

services and achieve reunification after his incarcerations. Indeed, Hunt testified she was "not used to seeing that in a case[.]" Ultimately, in June 2017, the court approved the Division's permanency plan of termination of parental rights followed by adoption because neither defendant nor J.C. were engaged in services.

At the trial, in responding to this accusation, defendant testified that he had stopped visiting G.C. after his September 2017 visit because he thought the judge cancelled his visits. He further explained that he missed the psychological and bonding evaluation because he had to perform community service for Drug Court and claimed that he left a message for Hunt advising her of the conflict. However, Hunt denied ever receiving such a message and defendant denied trying to reschedule the evaluation. Defendant also denied being notified about court ordered mediation, which he also failed to attend. By the time of trial, defendant had been working for a packaging company for two weeks, after having been in school for his GED the first three months of 2018, and anticipated advancing to phase two of Drug Court.

The judge considered Dr. Jeffrey's report and trial testimony regarding the bonding evaluation she conducted between G.C. and her resource parents. During the evaluation, the resource parents, one of whom was a nurse, recounted

G.C.'s medical and developmental problems related to her "prenatal drug exposure." Dr. Jeffrey acknowledged the resource parents' systematic and consistent handling of G.C.'s special needs, and their creation of "an established, organized, [and] attentive child-rearing environment" that had resulted in G.C. making progress while in their care. The resource parents reported to Dr. Jeffrey that they were committed, dedicated, and devoted to G.C., and wanted to adopt her if she became available for adoption. Hunt confirmed that "[o]n numerous occasions," the resource parents expressed their preference for adoption, after being advised of the differences between adoption and kinship legal guardianship (KLG).

After observing G.C.'s spontaneous display of affection to her resource parents, and how G.C. was "responsive" to them and looked to them as a "source of security and stability[,]" Dr. Jeffrey concluded that G.C. had "a secure attachment" to her resource parents. Further, because Dr. Jeffrey believed that severance of the attachment would place G.C. "at risk for serious and enduring harm[,]" she recommended that G.C. "remain" with her resource parents. Dr. Jeffrey explained that severing a child like G.C. from a secure attachment "de-stabilizes the child's development[,]" "knocks them off their normal developmental trajectory[,]" and could result in "lifelong . . . difficulties."

13

According to Dr. Jeffrey, if that occurred, the new caretaker, whether that was G.C.'s parents or someone else, would have to demonstrate tremendous "skill," "commitment," and "knowledge" in order "to get [the child] back on track."

After "review[ing] all of the evidence and all the caseworker notes[,]" the judge concluded the Division had proven, "by clear and convincing evidence," all four prongs of the "best interest[s]" test codified at "[N.J.S.A.] 30:4C-15.1." The judge explained that although the "harm [was] not the acute type of harm that we often seem to find in Title [9], . . . . [i]t [was] more of a slow walk harm, . . . recognized by the statute, and by case law as falling within the first prong." The judge stated it could also be described as "a kind of chronic neglect." Further, according to the judge, although defendant at age twenty-five "present[ed] as [an] affectionate and appropriately interactive father . . . during the first year or so of this litigation," in the second part of the litigation when "[defendant] made it clear he [would not] be able" to care for G.C. himself as he had planned, "his litigation position" changed. At that point, he believed that "anybody else" who was "biologically related to [him] and [his] child, and with whom [he would] be able to . . . visit as long as [he was] not too busy with [his] other child and other things, would be better tha[n] what he referred to as, the system."

14

In addressing prong two, the judge noted that defendant's "trouble with Drug Court track[ed] his changing attitude toward his daughter." The judge also commented that defendant's "mind set" reflected "his own experience" as a child who was in the "system" from adolescence through adulthood. In that regard, the judge determined that defendant failed to appreciate the "risk of serious and enduring harm" as contemplated in prong two that would result from removing G.C. from her very "loving and caring resource" parents who had cared for her since birth.

The judge also determined the Division "exercised very reasonable efforts" to meet its "obligations under [p]rong [three.]" The judge acknowledged the Division's efforts in facilitating visitation while defendant was in "jail," in "his in-patient treatment [program]," and in "the halfway house." The judge pointed to defendant's failure to avail himself of the services offered by the Division to prepare him to provide the "sustained and careful care [G.C.] need[ed,]" or to equip himself with the skills needed to address her "significant developmental needs[.]" The judge also highlighted defendant's failure to undergo counseling with Dr. Schafer or appear for his psychological and bonding evaluation with Dr. Jeffrey, which "could have been the basis for . . . [his] attorney to make a good argument about what kind of help he needed."

Noting that the Division was not required to "duplicate the work of the Drug Court[,]" the judge found that despite the Division's efforts, defendant failed to overcome "his difficulties with Drug Court," and correct the circumstances which led to G.C.'s placement outside the home. Instead, the judge found that defendant "delay[ed] . . . finding work, [and] attending school for his GED," and was consistently sanctioned for violating Drug Court rules and jailed "at very critical time[s] in [G.C.'s] life." Despite being "the beneficiary . . . of three extension[s] of the permanency plan to allow [defendant] to work with Drug Court on reunification," the judge observed that defendant failed to overcome his impediments. Rather, according to the judge, it was apparent that defendant "use[d] both systems against the other."

The judge also determined that "[t]he Division ha[d] proven by clear and convincing evidence that it ha[d] explored every other option available." The judge considered the Division's assessment of the relatives identified by defendant, all of whom were ruled out for appropriate reasons, "[a]nd[] nobody appealed, or presented themselves . . . to work with the Division[.]" Specifically, as to K.B., the judge explained that the Division's decision to rule her out for placement after G.C. had "been in placement for [eighteen] months," was an appropriate decision because at that "point" in the litigation, it was "not

16

in [G.C.'s] best interest." Further, the judge noted "KLG [was] not an option," because "adoption [was] available."

Regarding prong four, the judge acknowledged that "children should not be removed from parents simply because they are not perfect, or there[] [is] a better parent out there. They can only be removed when the parent [is not] minimally adequate." However, the judge credited Dr. Jeffrey's "objective" and uncontroverted expert opinion that in G.C.'s case, given her "level of need and complicated healthcare," "minimally adequate[] [was] not really what this child need[ed]." Nonetheless, the judge concluded that defendant was not even "minimally adequate" and would not "be in the foreseeable future" because "[h]e [had] no plan to be." According to the judge, defendant's only plan was that "[G.C.] would be cared for by his sister, and he would co-parent with her, [in] some way, shape, or form." However, the judge believed that based on "the level of on-and-off commitment he showed in the second half of [G.C.'s] placement life, he [would not] really [be] co-parenting under anybody's definition, either."

Relying "on Dr. Jeffrey's very considered and careful [o]pinion[,]" the judge concluded that separating G.C. from her resource parents "would have caused serious and enduring harm, with no way of knowing whether the sister

could have mitigated that [harm]." According to the judge, although "she clearly knew from caseworker notes she could have applied for custody," she was never "enlisted by [defendant] to become involved in that way," and she "[n]ever came to the courthouse," "appeal[ed] the administrative turn down," or "involved herself" in any way. The judge entered a memorializing order, and this appeal followed.

On appeal, defendant argues the judge's decision to terminate his parental rights was "not supported by adequate, substantial, credible evidence[.]" Further, defendant contends that because the judge's "opinion omits critical factual and legal findings to support the conclusions reached, it falls short of the requirements of [Rule] 1:7-4(a)." We disagree.

Our scope of review on appeals from orders terminating parental rights is limited. In such cases, we will generally uphold the trial court's findings, so long as they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). Indeed, we must give substantial deference to the family court judge's special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. Id. at 552-53. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable

18

as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Even where the parents allege "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Guided by these standards, we conclude that the judge's factual findings are supported by substantial credible evidence in the record, and her legal conclusions are sound. As to prongs one and two, we reject defendant's argument that the judge's ruling was "silent as to the harm [G.C.] faced and whether [defendant] was unable [or] unwilling to mitigate that harm." On the contrary, the judge determined that "chronic neglect" endangered G.C.'s safety, health, and development. Further, according to the judge, defendant's inability to provide a safe and stable home for G.C. and the delay of permanent placement compounded the harm, as evidenced by uncontroverted expert testimony that

separating G.C. from her "very . . . loving and caring" resource parents would cause "serious and enduring harm[.]"

The first prong of the best interests standards "addresses the risk of future harm to the child as well as past physical and psychological harm[,]" N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013), and "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). Moreover, where children "languish in foster care for many years without a permanent home[,]" the parents' failure to provide "a permanent, safe, and stable home" may itself harm the child, ibid., and the parents' "unabated behavior" following foster care placement as occurred here may cause "continuing harm by depriving [the child] of necessary stability and permanency." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 245 (App. Div. 2010).

As a result, there are "limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." K.H.O., 161 N.J. at 358. Thus, prong two focuses "on the measures taken by the parent after the child's birth to maintain the parent-child relationship and to foster an environment leading to normal child development[,]" id. at 352, and is met if

20                                                                    A-3988-17T1

"there is clear and convincing evidence that the child will suffer substantially from a lack of stability and a permanent placement," as well as "from the disruption of her bond with foster parents," as was the case here. Id. at 363.

Defendant also asserts the judge erred in assessing "[t]he sufficiency of [the Division's] reunification services[,]" particularly with respect to housing. "'Reasonable efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281. However, the reasonableness of the Division's efforts "is not measured by their success." D.M.H., 161 N.J. at 393. Instead, the Division's efforts must be viewed "with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." Id. at 390.

In this case, as Hunt explained, the Division's efforts were impeded by defendant's recurring incarcerations. In any event, "'[e]ven if the Division ha[s] been deficient in the services offered to' a parent, reversal of the termination order is not necessarily 'warranted, because the best interests of the child controls' the ultimate determination regarding termination of parental rights." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App.

21                                                              A-3988-17T1

Div. 2012) (alterations in original) (quoting N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007)).  Here, the best interests of G.C. were served by terminating defendant's parental rights.

Additionally, defendant contends the judge erred in determining the Division satisfied its statutory obligation to explore "placement with willing relatives" since G.C.'s aunt "was able and willing to obtain custody" of G.C. Without question, the Division is not permitted "to embark on a course set for termination of parental rights . . . without at least first exploring available relative placements."  N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011).  To that end, "[t]he Division must perform a reasonable investigation of such relatives that is fair, but also sensitive to the passage of time[,] and the child's critical need for finality and permanency."  N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

While "there is no presumption in favor of placement with relatives[,]" K.L.W., 419 N.J. Super. at 580, after "complet[ing] an assessment of each interested relative's ability to provide the care and support, including placement, required by the child[,]" id. at 578 (quoting N.J.S.A. 30:4C-12.1), if the Division "determines that the relative is unwilling or unable to assume the care of the

22                                                          A-3988-17T1

child, the [Division] shall not be required to re-evaluate the relative." N.J.S.A. 30:4C-12.1(b). The Division shall however inform the relative in writing of:

> (1) the reasons for the [Division's] determination;
>
> (2) the responsibility of the relative to inform the [Division] if there is a change in the circumstances upon which the determination was made;
>
> (3) the possibility that termination of parental rights may occur if the child remains in resource family care for more than six months; and
>
> (4) the right to seek review by the [Division] of such determination.
>
> [Ibid.]

Here, we agree with the judge that the Division satisfied its statutory obligation and that prong three was met by clear and convincing evidence. Indeed, all relatives were properly assessed and ruled out. When K.B. sought reconsideration, the Division's rejection demonstrated sensitivity "to the passage of time[,] and the child's critical need for finality and permanency." J.S., 433 N.J. Super. at 87.

Finally, we reject defendant's contention that the judge "did not address or make a ruling with respect to the fourth prong[.]" The fourth prong does not "require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Rather, the question is "whether,

after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. That decision "necessarily requires expert inquiry specifically directed to the strength of each relationship." Ibid. (quoting In re Guardianship of J.C., 129 N.J. 1, 25 (1992)). Relying on Dr. Jeffrey's uncontroverted expert opinion, the judge correctly concluded that, on balance, separating G.C. from her resource parents would cause greater harm.

"It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012). Here, the judge reviewed the evidence presented at trial, made detailed findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. Contrary to defendant's assertions, the judge's opinion complies with Rule 1:7-4(a), tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), and comports with applicable case law. See, e.g., F.M., 211 N.J. at 447-54; N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 103-07 (2008); K.H.O., 161

N.J. at 347-63; <u>D.M.H.</u>, 161 N.J. at 375-93; <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 604-11 (1986).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3988-17T1